UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Susan E. Fedele


           v.                          Civil No. 08-cv-520-JD
                                       Opinion No. 2009 DNH 090

Michael J. Astrue, Commissioner,
Social Security Administration


                            O R D E R

     Susan E. Fedele seeks review, pursuant to 42 U.S.C. §
405(g), of the Commissioner's decision denying her application
for social security disability insurance benefits.  She contends
that the Administrative Law Judge ("ALJ") erred by not consulting
a medical advisor, failing to properly credit her husband's
testimony at the hearing, and failing to give controlling weight
to the residual functional capacity evaluations completed by her
treating physicians.  The Commissioner moves to affirm.


                           Background

     Susan Fedele filed an application for disability insurance
benefits on August 25, 2006, alleging that she had been disabled
by the effects of multiple sclerosis since May 31, 1992.  Fedele
had a college education and had previously worked as a registered

nurse.  She was forty-six years old when she filed her
application.[1]

    The administrative medical record begins with a treatment
note by Dr. Gerald Indorf in May of 1992 when Fedele complained
of numbness in her right arm after gardening.[2]  After testing,
Dr. Indorf assessed brisk reflexes and sensory deficits in
Fedele's right arm and leg, which he felt were "more central"
rather than the result of carpal tunnel syndrome.  A magnetic
resonance imaging ("MRI") study of her cervical spine, done on
May 28, 1992, showed an abnormal signal.  Dr. Oot wrote that a
demyelinating process, such as multiple sclerosis, was a possible
cause.  On June 2, 1992, Fedele had a brain MRI that showed
multiple abnormal areas.  Dr. Matthew Levine thought the most
likely diagnosis was a demyelinating process such as multiple
sclerosis.

    Dr. Indorf met with Fedele and her husband on June 4, 1992.
He reported to them that her imaging studies and clinical
presentation were consistent with a demyelinating disease.  He

---

    [1]The parties' joint factual statement mistakenly states that
Fedele was thirty-five years old on the date when the ALJ issued
the decision in her case in September of 2008.  The record shows
that she was thirty-five in September of 1995, when her insured
status expired.

    [2]Fedele's medical records are incomplete because some of the
records were unavailable by the time she filed her application.

explained that the exacerbation of her systems could be associated with her pregnancy.  In response to her husband's question, Dr. Indorf said that the only lifestyle changes he recommended were to avoid overheating and particularly exercising in the heat.  On August 11, 1992, Fedele reported to Dr. Indorf that she was having a complete remission of her symptoms, but she also reported slight tingling in her hands and feet and tiredness.  Dr. Indorf diagnosed multiple sclerosis and recommended that Fedele avoid excessive heat.

On November 10, 1992, Dr. William House gave Fedele a Pattern Shift Visual Evoked Response Study, which was abnormal. Dr. House felt that clinical correlation was necessary.

Fedele saw Dr. Joan Breen on December 19, 1995, for a follow-up appointment, after her initial visit in mid-1994.  Dr. Breen reported that Fedele, who was pregnant, was doing well overall.  Fedele reported some numbness and diminished sensation in her right leg and a period of increased tripping which had lasted for about two months.  She denied other symptoms, except that she had mild occasional tingling of her right finger tips, which had continued since May of 1992.  Dr. Breen thought Fedele's leg numbness was due to multiple sclerosis.

A year later, in November of 1996, Fedele told Dr. Breen that she had started to feel off balance when she was playing

3

tennis or running.  Her vision was unaffected; she had no
difficulty gripping her tennis racquet, and her other fine motor
skills remained normal.  Fedele thought her balance had improved
after she received treatment for a sinus infection.  The results
of Fedele's neurological exam were quite good, and Dr. Breen
thought the balance issue was caused by the sinus infection.  Dr.
Breen concluded that overall Fedele continued to be stable and
quite good as far as her multiple sclerosis.

In April of 1998, Fedele reported to Dr. Breen that she was
not doing as well as she had the year before.  She said that she
was not able to play tennis as well as she used to and that she
was catching her toes and tripping.  She also reported blurred
vision while playing tennis and feeling more fatigued.  She did
not have difficulty reading, writing, cooking, or caring for her
three children.  Her memory and cognition were fine.  She said
that she exercised by running about three miles each day and
remained involved in her community and her children's activities,
which was a demanding schedule.  An MRI in May of 1998 showed
more areas of abnormal signal compared to the 1992 MRI.  In May
of 1999, Dr. Breen reported that Fedele had remained stable over
the past year, that she had some difficulties with balance and
had stopped playing tennis, and that she continued to exercise
regularly.

Fedele saw Dr. Patricia Locuratolo in October of 1999 for relapsing remitting multiple sclerosis.  Dr. Locuratolo reported that Fedele had numbness in her right arm and some visual blurring but no major exacerbations.  Despite some mild neurological dysfunction, Fedele exercised vigorously almost daily and attended yoga.  When she saw Dr. Locuratolo again, in June of 2001, Fedele was feeling fairly well.  Dr. Locuratolo noted that Fedele had had an exacerbation of her symptoms during the summer of 2000.

Fedele saw Dr. David Hafler in July of 2001 who noted that she had done very well until 1996 when the early progressive phase of the disease began.  He noted that Fedele and her husband had noticed that she had difficulty walking since 1997.  In Dr. Hafler's opinion, Fedele had entered the early stages of chronic progressive multiple sclerosis and would slowly but progressively get worse.  By November of 2003, Fedele reported unstable balance so that she required bilateral support to walk more than twenty-five feet.  She also had difficulty holding things with her hands.

In March of 2007, a state agency physician, Dr. Joseph Cataldo, reviewed Fedele's available medical records for the

period between May of 1992 and September of 1995.[3]  Dr. Cataldo
noted that her records did not include an evaluation of her
physical capacities by a treating source.  He concluded that
Fedele was capable of performing work at the light exertional
level during that period, with postural requirements, such as
balancing and stooping, limited to occasionally, and with a
limitation to avoid even moderate exposure to heat and hazards.

Dr. Henry Sonnenborn evaluated Fedele's functional
limitations in May of 2007 and found them consistent with
complete disability.[4]  Dr. Breen agreed with that evaluation in
June of 2008.  A typed line at the bottom of Dr. Breen's form,
underneath her signature stated:  "This evaluation reflects Mrs.
Fedele's limitations on 9/30/1995."  Dr. Sonnenborn completed a
second evaluation on July 7, 2008, with the same results.  The
same statement was typed under Dr. Sonnenborn's signature:  "This
evaluation reflects Mrs. Fedele's limitations on 9/30/1995."  Dr.
Sonnenborn wrote on a prescription pad that he had been Fedele's
primary care physician for the past twenty years, including
September 30, 1995.

--------

[3]Fedele's last insured date was September 30, 1995.

[4]At the hearing, Fedele's husband testified that Dr.
Sonnenborn's treatment notes were not in the record because they
were not available due to the passage of time.

A hearing on Fedele's application was held on August 7, 2008.  Fedele and her husband testified at the hearing.[5]  Fedele testified that her condition had become progressively worse over the years.  She had been using a walker for the past five years, had stopped driving, had some assistance at home, and had recently broken her arm in a fall.  Fedele explained that she did not apply for social security benefits until August of 2006 because that was when she realized she needed to have physical and financial help.

Fedele's husband testified that between 1992 and September of 1995, Fedele experienced multiple episodes when she had paresthesias (tingling and numbness) in both hands, inability to walk, and inability to stand for long periods.  He also testified that Fedele had to give up sports and exercise completely before September of 1995, that she could not work as a nurse because she could not lift, stand, or walk for prolonged periods, and that she would need to sit every thirty minutes and lie down at unpredictable times due to fatigue.  He agreed with the evaluations done by Dr. Breen and Dr. Sonnenborn in 2008 and testified that those evaluations accurately reflected Fedele's condition as of September 30, 1995.

----

[5]Fedele's husband is a physician.

The ALJ issued a decision denying Fedele's application on September 2, 2008.  The ALJ found that Fedele had multiple sclerosis before September of 1995, which was a severe impairment.  He concluded, however, that she retained the ability to do a full range of sedentary work and could do jobs that existed in significant numbers in the national economy.  Therefore, the ALJ found that Fedele was not disabled before her last insured date.  The Decision Review Board affirmed the ALJ's decision, making it the final decision of the Commissioner.

## Discussion

The ALJ denied Fedele's application at the fifth step of the sequential analysis used to evaluate social security applications.[6]  Fedele contends that the ALJ erred by failing to consult with a medical advisor pursuant to Social Security Ruling ("SSR") 83-20, that the ALJ did not properly evaluate or credit her husband's testimony, and that the ALJ improperly failed to give her treating physicians' opinions controlling weight.  The

---

[6]A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a).  The applicant bears the burden through the first four steps to show that he is disabled.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner bears the burden of showing that jobs exist in the national economy that the applicant can perform.  Id.

Commissioner disputes Fedele's contentions and moves to affirm the decision.

The court's review under § 405(g) is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  The Commissioner makes credibility determinations and draws inferences from the evidence.  <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991).  If the ALJ's factual findings are supported by substantial evidence in the record, they are conclusive, even if other evidence would support a contrary conclusion.  <u>Nguyen</u>, 172 F.3d at 35; <u>Tsarelka v. Sec'y of Health & Human Servs.</u>, 842 F.2d 529, 535 (1st Cir. 1988).

A.   <u>SSR 83-20</u>

SSR 83-20 addresses the means of determining an onset date of disability.  Pertinent to this case, SSR 83-20 states:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the

> date last worked are far in the past and adequate
> medical records are not available.  In such cases, it
> will be necessary to infer the onset date from the
> medical and other evidence that describe the history
> and symptomatology of the disease process.

1983 WL 31249, at *2.   The onset date must be determined based on the facts of the case "and can never be inconsistent with the medical evidence of record."  Id. at *3.  A determination of how long a disease may have been severe enough to be disabling "depends on an informed judgment of the facts in the particular case . . . [that] must have a legitimate medical basis."  Id. "At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred."  Id.

Fedele argues that SSR 83-20 applies here because some of her medical records for the period between 1992 and September of 1995 are unavailable and because an onset date of her disability must be inferred.  She contends that the ALJ was required to consult with a medical advisor to determine the onset date of her disability and that the ALJ's failure to do so requires reversing the decision.  The Commissioner responds that the medical evidence here is adequate to determine the onset date of Fedele's disability so that a medical advisor was not necessary.

Dr. Indorf's contemporaneous medical records, along with the results of various tests performed by other doctors, sufficiently document the progress of Fedele's disease during the relevant

10

period.  The medical records show that Fedele was diagnosed with
multiple sclerosis during that period.  The records show that her
symptoms were mild or in remission during that time.  Dr. Breen's
records, beginning in December of 1995, document that Fedele was
still doing well at that time and that over the past year and a
half her only complaint was mild and occasional tingling in her
right finger tips.  Therefore, the medical records were adequate
to show that Fedele's symptoms had not become disabling during
that time period and no inference of an onset date was necessary,
which would implicate SSR 83-20.[7]


B.  Husband's Testimony

     Fedele contends that the ALJ did not properly consider her
husband's testimony, as required by 20 C.F.R. § 404.1529(c)(3),
SSR 83-20, and SSR 96-7.[8]  She argues, noting that her husband is
a physician, that his testimony provided the missing evidence

---

     [7]In addition, the reference to a medical advisor in SSR 83-
20 is not mandatory, so that failure to comply may not require
reversal of the ALJ's decision.  See Eichstadt v. Astrue, 534
F.3d 663, 667 (7th Cir. 2008).

     [8]SSR 96-7 addresses the process for assessing an applicant's
credibility with respect to her descriptions of her symptoms and
impairments but does not require that the credibility of
witnesses at the administrative hearing be similarly assessed.
As discussed above, SSR 83-20 does not apply in the context of
this case where medical evidence is available and an inference of
an onset date is not required.

about her symptoms during the relevant period between 1992 and 1995.[9]  The Commissioner asserts that the ALJ adequately considered Fedele's husband's testimony.

Section 404.1529(c)(3) explains that the ALJ will consider information about an applicant's symptoms, in addition to the medical record, to determine the severity of the symptoms.  When a lay witness provides testimony about the applicant's symptoms, the ALJ must consider that evidence and must give specific reasons for disregarding the testimony.  Page v. Astrue, 2009 WL 700148, at *4 (D.N.H. March 16, 2009).[10]  Fedele contends that the ALJ's brief discussion of her husband's testimony disregarded his important testimony about the level of her impairments prior to September of 1995 and incorrectly summarized his testimony.

Fedele's husband testified that Fedele was disabled by the effects of multiple sclerosis by September of 1995 and that the degree of disability indicated in the evaluations done by Dr. Sonnenborn and Dr. Breen in June and July of 2008 accurately indicated the level of her disability by September of 1995.

---

[9]As the Commissioner points out and Fedele concedes, her husband was testifying as a family member not in his capacity as a physician.  Therefore, his testimony is not entitled to any deference based on his training.

[10]In Page, ALJ Klingebiel, who was also the ALJ in this case, appeared to entirely ignore the hearing testimony of the applicant's mother.

Although the ALJ considered Fedele's husband's testimony, as demonstrated by his discussion in his decision, he disregarded that part of the testimony as to the severity of her impairments in September of 1995.  The ALJ did not give reasons for disregarding that testimony, which is error.

The error, however, is harmless.  Fedele's husband's testimony about the severity of her impairments in September of 1995 is contradicted by the medical record.[11]  See Grebenick v. Chater, 121 F.3d 1193, 1199-1200 (8th Cir. 1997).  For example, while her husband testified that she had given up all sports and exercise by September of 1995, the medical records show that Fedele continued to play tennis until 1999 and continued to exercise and participate in yoga after that.  In addition, Fedele was pregnant with their third child in September of 1995 and reported to her doctors in 1998 that she had no difficulty in taking care of the children and that she remained active with them and in the community, which was a demanding schedule.  The medical evidence also shows that her disease had not progressed to the extent her husband described by September of 1995.

---

[11]Because the medical records document the progress of Fedele's disease, her husband is not the only source of information about her impairments.  See Willcockson v. Astrue, 540 F.3d 878, 881 (8th Cir. 2008).

C.  Treating Physician Opinions

     In making a disability determination, the ALJ generally will
give more weight to the opinions of treating physicians, because
of the benefit and perspective provided by a treating
relationship, and will give them controlling weight if they are
well supported by clinical medical evidence and consistent with
other evidence in the record.  20 C.F.R. § 404.1529(d)(2); see
also SSR 96-2p.[12]  The weight to be given a treating physician's
opinion is based on a consideration of the length of the
treatment relationship, the nature and extent of the
relationship, whether relevant evidence supports the opinion, the
extent to which the opinion is consistent with the record as a
whole, the area of the physician's specialty, and other factors
that are brought to the ALJ's attention.  § 404.1529(d)(2)-(6).
Retrospective opinions, which give an opinion about the
claimant's condition in the past, may have probative value, but
they are not entitled to controlling weight "when they are not
supported by diagnostic testing."  Robson v. Astrue, 526 F.3d
389, 393 (8th Cir. 2008).  An ALJ explains the reasons for the

_____

     [12]In SSR 96-2p, the Social Security Administration  defined
the terms "controlling weight," "medically acceptable," "not
inconsistent," and "substantial evidence" and further explained
the analysis for determining what weight to give physician's
opinions.  1996 WL 374188.

weight given to the opinion in the determination.   §
404.1529(d)(2).

In this case, Fedele submitted evaluations completed by her
treating physicians, Dr. Breen and Dr. Sonnenborn, that were
dated in June and July of 2008.  Their evaluations found that
Fedele had severe limitations that were consistent with complete
disability.  Under each physician's signature, at the bottom of
each form, a typed statement was added:  "This evaluation
reflects Mrs. Fedele's limitations on 9/30/1995."  Fedele
intended the evaluations to be taken as retrospective opinions of
her limitations in 1995.

The ALJ noted Dr. Breen's and Dr. Sonnenborn's opinions and
explained that they were not entitled to controlling weight
because they were not supported by medical evidence and were
inconsistent with other substantial evidence in the record.  The
ALJ noted that the opinions were given twelve years after the
time in question.  He also found that the opinions were not
supported by contemporaneous medical records or the medical
record as a whole.  The ALJ concluded that the opinions were
entitled to only minimal weight.

Fedele faults the ALJ's findings on the grounds that her
diagnosis of multiple sclerosis, before September of 1995, could
have produced the symptoms of which she complained and that her

treating physicians' opinions confirmed that to be the case.[13]
She contends that because the record does not include treatment
notes from Dr. Breen or Dr. Sonnenborn before September of 1995,
the opinions are not inconsistent with those records.  She also
argues that the ALJ erred by not considering the length of her
treatment relationships and the other factors that affect the
weight to be given their opinions.

To the extent Dr. Breen and Dr. Sonnenborn intended their
2008 evaluations to be considered as their opinions of Fedele's
condition before September 30, 1995, their opinions conflict with
the record evidence, as the ALJ found.  Dr. Breen's 2008
evaluation of Fedele's condition is contradicted by her December
1995 treatment notes, which reference Fedele's condition a year
and a half prior to that date, and to the subsequent medical
evidence, which shows that Fedele did not experience disabling
symptoms until after 1999.  Dr. Sonnenborn's 2008 evaluation of
Fedele's condition before September of 1995 is also contrary to
Dr. Breen's medical record and to subsequent medical evidence.

---

[13]In her reply, Fedele contends that the Commissioner cannot
now challenge the authenticity of the evaluations, as
retrospective opinions, because the ALJ did not raise or rely on
that issue.  Because the ALJ properly evaluated the doctor's
opinions, the court does not reach the question of whether they
were properly submitted as retrospective opinions.

Therefore, the ALJ properly determined that those opinions were entitled to only minimal weight.

<u>Conclusion</u>

For the foregoing reasons, the plaintiff's motion to reverse (document no. 5) is denied.  The Commissioner's motion to affirm (document no. 7) is granted.  The Commissioner's decision is affirmed.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

June 23, 2009

cc:  Jeffry A. Schapira, Esquire
     Gretchen Leah Witt, Esquire

17